UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 3:12-00136 |
| | ) | Chief Judge Haynes |
| CHRISTOPHER N. BONICK, | ) | |
| Defendant. | ) | |

# MEMORANDUM

The United States filed this action against the Defendant, Christopher N. Bonick, charging him with attempting to persuade a female under the age of eighteen to engage in unlawful sexual activity and for possession of child pornography.

Before the Court are Defendant's motions to suppress (Docket Entry Nos. 36, 42 and 46), to which the Government responded (Docket Entry Nos. 66 and 80). Defendant contends that statements made by Defendant to Detective Michael Adkins on January 5, 2012 and January 9, 2012, and to Detective Tommy Roberts on April 4, 2012, should be suppressed as a violation of his Fifth, and Sixth Amendment rights. Defendant also contends that law enforcement officers failed to identify certain documents and photographs shown to Defendant during his interrogations, depriving his counsel from effectively challenging the Government's case, and that these documents and photographs should be suppressed. Defendant further contends that statements made by a witness should be suppressed as the use of such statements would deprive Defendant of his right to confront witnesses under the Sixth Amendment.

In response, the Government contends that the two January interviews conducted by Detective Adkins were in Defendant's home, of short duration and non-custodial. As to the April 4, 2012 interview, the Government asserts that it does not intend to use any statements made at this interview at trial nor can Defendant show that the Government obtained any evidence from this interview. The Government also contends that it does not plan to use the witness's taped interview in lieu of the witness's live testimony.

The Court conducted an evidentiary hearing on Defendant's motions to suppress on May 13, 2013.

### A. Review of the Record

### 1. January 5, 2012 Interview of Defendant

Michael Adkins, a Detective with the Metro Nashville Police Department and assigned to its Criminal Investigation Division, Sex Crimes Section, Internet Crimes Against Children Task Force, testified that on or around December 28, 2011, he received information from an undercover investigator in Louisiana, who was posing as a 14 year old female, that she was approached by a suspect using the screen name "cccbonick." (Docket Entry No. 91 at 8-9). According to this investigator, she engaged in several chats with Defendant from about July 2010 to July 2011, and although she informed Defendant multiple times that she was a minor, Defendant engaged in sexual conversations with her, sending a nude image of himself and asking her to send a nude image of herself. Id. at 9-11; Suppression Hearing Exhibit 1. On July 27, 2011, Defendant suggested that he travel across state lines to Louisiana to have sex with the minor girl. Id. at 11; Exhibit 1. During this same chat, Defendant stated that he met a 15 year old female online on a website called "Teenspot" and had sex with her when she was 15 and he was 25. Id. at 18-19; Exhibit 1.

After determining the internet provider address used during these chats was associated with an account at Defendant's residence, Adkins obtained a state search warrant for Defendant's residence and executed the search warrant on January 5, 2012. Id. at 13. Four police officers accompanied Adkins in the execution of the search warrant. Id. at 14. Adkins knocked on the door and identified himself as a Metro police detective upon Defendant opening the door. Id. at 15. At the time of the search, Defendant was alone in his residence. Id. at 13. Adkins made an audio recording of the execution of the search warrant and questioning of Defendant. The audio recording begins as Adkins knocks on Defendant's door and records the entire interview that lasts the duration of the search, approximately one hour. Id. at 19-20, 30-31.

Adkins asked Defendant if he and the officers could come inside to which Defendant responded in the affirmative. Id. at 15. Adkins asked Defendant if he had any weapons and Defendant responded that he did not. (Docket Entry No. 74, Notice of filing, Audio recording at 0:00:54). Adkins patted Defendant's pockets to make sure Defendant did not have any weapons, but Defendant "was never put on the wall or nothing like that." (Docket Entry No. 91 at 36). Adkins explained that he had a search warrant for Defendant's residence, informed him that other people were going to search his apartment while he informed him as to what "was going on," told Defendant to "have a seat" and advised Defendant that he was not under arrest. Id. at 15.; Docket Entry No. 74, at 0:01:00--0:01:12. Adkins, Detective Michelle Hammond and Defendant sat down at Defendant's kitchen table. Id. at 15-16. Defendant's chair was "basically in the middle of the hallway" whereby Defendant "could have walked straight out through the front door." Id. at 16.

Adkins advised Defendant that regardless of the search warrant he was not under arrest, he was not going to jail that day, he did not have to speak to Adkins, and he did not have to stay during

3

the search as Adkins offered to call him when the search was completed. (Docket Entry No. 74, at 0:01:38--0:02:22). Defendant responded that he would talk to Adkins. Id. at 0:02:23. Adkins restated that Defendant was free to leave at any point and then asked Defendant if he knew why they were there. Id. at 0:02:30. Defendant stated that he had some issues that he was trying to work through and then asked if Hammond could leave so that he could speak to Adkins in private. Id. at 0:02:34–0:02:47. Adkins said that they could talk outside in his vehicle or wherever he felt more comfortable, but Defendant preferred to stay at his residence. Id. at 0:02:48--0:03:08. According to Adkins, Hammond left the room and began searching the residence. (Docket Entry No. 91 at 15, 17).

Defendant stated that he was in the military and after he returned from Iraq he conversed online with "some girls" and "probably said some stuff that I shouldn't have, but I had no intention of doing anything." (Docket Entry No. 74 at 0:03:20--0:03:32). Defendant stated that he chatted with maybe 5 or 6 girls under the age of 18 and that 2 or 3 of those conversations turned sexual. Id. at 0:05:00--0:05:22. Defendant then stated that he may have sent of one the girls a picture of his penis and asked naked pictures from "maybe one or two" of the girls and may have received naked pictures from one or two of them. Id. at 0:05:24--0:05:45. Defendant admitted that he used the screen name "cccbonick" and that he also uses the screen name "FWOGMAN." Defendant also stated that he visited the chat room known as "Teen Chat." Id. at 0:05:50--0:06:39.

Adkins showed Defendant the chat log and photographs that Defendant exchanged with the undercover officer in Louisiana. (Docket Entry No. 91 at 17-18; Exhibits 1 and 3). As to the undercover officer, Defendant initially stated that he believed the person was a "guy" and that he was "kind of messing with a person." (Docket Entry No. 74 at 0:07:25--0:07:36). Adkins then advised

4

Defendant that he needed "to be honest with me about things." Id. at 0:07:40--0:07:42. Adkins stated that he appreciated Defendant being honest with him about having a problem with which he was dealing, advised him that his computers were going to be forensically examined and stated that he believed that the officers were going to discover that he had chatted with more than 2 or 3 young girls, to which Defendant responded "I've chatted to more." Id. at 0:08:00--0:09:54.

Adkins responded, "I completely understand, it's hard to be honest about that. . . . I don't expect you to have numbers on a board, ok? But if you tell me 2 or 3 and I go in there and find 50, we're going to have an issue, ok? . . . [W]hen that forensic is done . . . I wanna be able to . . . say . . . [Defendant] was honest with me about everything. . . . All I'm asking for, I know it is difficult, all I'm asking for you to do is to be honest with me about what is going on, ok?" Id. at 0:9:53--0:10:58. Defendant then admitted that he chatted with approximately 20 to 25 minor girls, that 10 to 15 chats turned sexual and that he received nude photographs from about half of the minor girls. Id. at 0:11:00--0:11:27.

After informing Defendant that the officers were going to seize his cellular telephone, Defendant asked Adkins permission and was allowed to retrieve it to copy down some telephone numbers that were stored on his cellular telephone. Id. at 0:18:33--0:21:49.

Adkins then showed Defendant a picture of a dog penis as referenced in the chat with the Louisiana investigator, and Defendant admitted to sending it. (Docket Entry No. 91 at 18; Exhibit 2). Defendant also admitted to sending a picture of himself. Id. As to the 15 year old female with whom Defendant claimed in his chat with the Louisiana investigator to have had sex, Defendant admitted to Adkins that the sexual encounter occurred when he was on leave from the military in 2010 when he flew to Nashville from Iraq, drove to Murfreesboro, met the 15 year old girl and had

5

sex with her at a local motel. Id. at 19; Docket Entry No. 74 at 0:38:00–0:39:10. During the course of this interview, Defendant explained that he was sexually attracted to females between the ages of 14 and 20 years old, admitted to meeting in person 5 to 6 minor girls that he met online and acknowledged that he may have gone to Louisiana to meet the undercover agent posing as a 14 year old girl to have sex with her if she had been willing. (Docket Entry No. 74 at 0:28:52--0:28:58; 0:37:46--0:37:57; 0:45:26--0:46:33).

Towards the end of the interview, Defendant asked Adkins if he had a number for a counselor because he wanted to get help. Adkins responded that he could not recommend one, but suggested that Defendant use the library's computer to search for one. Id. at 0:47:11--0:47:42. Shortly, Defendant asked Adkins, "What's the worst case scenario?" and Adkins responded that Defendant could go to prison. Id. at 0:49:37--0:49:39. Upon Adkins telling Defendant that he would go over the list of the property that the officers were seizing, Defendant asked Adkins if he thought that he needed a lawyer, to which Adkins responded that "it is completely up to you" and that "I can't advise you on something like that." Id. at 0:53:09--0:53:14. At the end of the interview, Adkins thanked Defendant, and the officers left Defendant's residence without arresting Defendant.

Listening to the audio recording reveals that throughout the interview Adkins asked Defendant to be honest, but Adkins did not raise his voice nor did the tone of his voice sound aggressive or threatening.

### 2. January 6, 2012 Interview of Witness

On January 6, 2012, after identifying the minor female in Murfreesboro, Adkins interviewed the witness at her school. (Docket Entry No. 91 at 20). Adkins made an audio recording of this interview. Id. At the time of the interview, the witness was 17 years old. Id. Adkins testified that

he typically would have a forensic examiner interview a witness who is a prepubescent child because "[t]hey are better trained to talk with the younger children" and that sometimes forensic examiners will interview a teen age minor depending on the age and circumstances. Id. at 21. Adkins stated that he did not use a forensic examiner to interview this witness because "[t]hey really don't need a forensic interview for something like that." Id. at 22. According to Adkins, the witness provided "very similar details about everything that happened before the motel room and after the hotel room," but "[h]er version of the incidents that happened inside the hotel room were a little bit different than [Defendant's]," as she gave into having sex with Defendant because she felt trapped, not because she wanted to have sex. Id.

While Adkins asked several leading questions to the witness and used a sympathetic tone, the audio recording reveals that the witness at times spoke at length in her narrative of events and provided much information that was not elicited by leading questions. (Docket Entry No. 81, audio recording of witness's interview). Adkins also periodically restated the witness's statements and asked clarifying questions. Towards the end of the interview, when the witness expressed fear about her mother learning of her involvement with Defendant, Adkins told her to "let me worry about your mother, okay" Id. at 0:26:48-0:27:03. Following this exchange, the witness did not provide any further statements regarding the sexual incident in the hotel, although she did describe a non-sexual encounter with him at Defendant's apartment that she alluded to earlier in the interview.

At the conclusion of the interview, Adkins told the witness that Defendant needed to go to jail, that he believed she was raped, reiterated that although she had made some mistakes, the rape was not her fault as Defendant exploited her, but cautioned that there might be insufficient evidence

7

to prosecute him for rape. Id. at 0:31:34–0:33:00. At this point in the interview, the witness does not provide any further information about Defendant to Adkins.

Following this interview, Adkins contacted Detective Tommy Roberts of the Murfreesboro Police Department and advised him of what he discovered and asked him to file a report because the incident occurred in Roberts's jurisdiction. (Docket Entry No. 91 at 22-23, 40-41). Adkins provided Roberts with some information regarding the interviews conducted on January 5, 2012 with Defendant and on January 6, 2012, involving the witness. Id. at 40, 53.

### 3. January 9, 2012 Interview of Defendant

On January 9, 2012, Adkins returned alone to Defendant's residence to conduct a second interview of Defendant. (Docket Entry No. 91 at 23). Adkins made an audio recording of this interview. Adkins asked if he could enter Defendant's residence, and Defendant consented. Id. at 24. Adkins explained that he wanted talk to Defendant about the investigation, but that he did not have to talk to him, that he did not have a search warrant for his residence, that he could tell Adkins to leave, and that Defendant could answer some or none of Adkins's questions if he chose. Defendant agreed to talk with Adkins. Id.; Docket Entry No. 74, audio recording at 0:01:13–0:02:34. Adkins asked Defendant about his sexual relationship with the female witness from Murfreesboro. Id. Adkins noted that Defendant's account of what transpired in the hotel room differed from the witness's and asked about those differences. During this interview, Defendant did not ask to speak to an attorney nor did Adkins threaten Defendant with arrest. Id.; Docket Entry No. 74. At the conclusion of the interview, Defendant advised Adkins that during the previous search the officers failed to search a closet behind a mirror in his bedroom and offered Adkins to search it. (Docket Entry No. 74, at 0:40:15–0:41:30). Adkins then thanked Defendant for talking to him and left

Defendant's residence without arresting him. The interview lasted approximately 48 minutes. (Docket Entry No. 74).

### 4. April 4, 2012 Interview of Defendant

On April 4, 2012, Detective Roberts conducted a video recorded interview of Defendant who was incarcerated at the Murfreesboro jail. (Docket Entry No. 91 at 51-52). During the interview, Roberts showed Defendant a picture of the victim witness, of Defendant holding up a small animal and of a young female who was later determined to have no connection with the case against Defendant. Id. at 54. Roberts testified that he was investigating Defendant for the crime of aggravated statutory rape and has not been involved in the federal investigation of Defendant. Id. at 57-58. Roberts stated that he gave a copy of Defendant's interview to Adkins, but did not provide any reports of his investigation to Adkins. Id. at 58. Adkins also testified that he did not receive any investigative information from Roberts. Id. at 50.

### B. Conclusions of Law

Under the Fifth Amendment to the United States Constitution, a defendant in a criminal action cannot be compelled to be a witness against himself. Consistent with that right, in Miranda v. Arizona, 384 U.S. 436, 467-74, 478-79 (1966), the Supreme Court held that a person in police custody must first be informed in clear and unequivocal terms that he has the right to remain silent, that he has a right to consult an attorney before any questioning and can cease the interrogation to request counsel, that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires, and that any statements made after these warnings can be used against him in a court of law. "The Miranda rule's application is limited to 'custodial interrogations,' which the Supreme Court has defined as, 'questioning initiated by law enforcement officers after a person

has been taken into custody or otherwise deprived of his freedom of action in a significant way.'" United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998) (quoting Oregon v. Mathiason, 429 U.S. 492, 494 (1977) (citation and internal quotation marks omitted)). Therefore, "for Miranda to apply, the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest." Id. (citing California v. Beheler, 463 U.S. 1121, 1125 (1983)).

In Mathiason, the Supreme Court distinguished a "custodial interrogation" from the questioning of a suspect in a "coercive environment," stating:

> [A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question.

429 U.S. at 495; Salvo, 133 F.3d at 948. Thus, "[t]he question in the end is not whether the individual felt pressure to speak to the officers but whether [the defendant] was forced to *stay* with them." United States v. Panak, 552 F.3d 462, 471 (6th Cir. 2009) (emphasis added).

To determine whether a defendant is in custody, courts apply the totality of the circumstances approach "with 'the ultimate inquiry' turning on whether 'a formal arrest' occurred or whether there was a 'restraint on freedom of movement of the degree associated with a formal arrest.'" Panak, 552 F.3d at 465 (quoting Stansbury v. California, 511 U.S. 318, 322 (1994) (citations and internal quotation marks omitted)); Salvo, 133 F.3d at 948. "The Miranda custody inquiry is an objective test." Yarborough v. Alvarado, 541 U.S. 652, 667 (2004). This inquiry is "to determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his

or her freedom of action.'" Panak, 552 F.3d at 465 (quoting Stansbury, 511 U.S. at 325) (internal quotation marks omitted)). Thus, the inquiry involves "two essential questions: '[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" Coomer v. Yukins, 533 F.3d 477, 485 (6th Cir. 2008) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." Stansbury, 511 U.S. at 325. Further, appealing to a suspect's "interest in telling the truth and being helpful to a police officer" is "consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." Yarborough v. Alvarado, 541 U.S. 652, 664-65 (2004).

As to determining custody, courts are to consider the following factors:

(1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

Salvo, 133 F.3d at 950; United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010) (in determining whether an interrogation was custodial, courts consider "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.").

11

The Sixth Circuit has noted that "'when police question a suspect in a residence,' the encounter 'often' will 'not rise to the kind of custodial situation that necessitates Miranda warnings.'" Panak, 552 F.3d at 466 (citations omitted); see Hinojosa, 606 F.3d at 883 ("It is significant to our inquiry that the questioning occurred at Defendant's home. This court has found that such a venue generally does not present a coercive environment."). This generalization arises because "an important factor underlying Miranda was the interrogator's goal of 'isolating the suspect in unfamiliar surroundings . . . to subjugate the individual to the will of his examiner.'" Id. (quoting Beckwith v. United States, 425 U.S. 341, 346 & n.7 (1976) (internal quotations omitted)). A home "presumably is the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave. . . . [A]ll individuals, the meek and the brazen alike, generally will find it easier to exercise such control on their home turf than at the station house." Id. at 465-66.

Yet, "[e]ven when an interrogation takes place in the familiar surroundings of a home, it still may become custodial without the officer having to place handcuffs on the individual." Id. at 466 (citing Orozco v. Texas, 394 U.S. 324, 325–26 (1969)). Factors such as the "number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell—turning an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining." Id. (citation omitted).

Based upon the totality of the circumstances, the Court concludes that Defendant was not in custody for Miranda purposes during his January 5, 2012, interview. The interview took place in

12

Defendant's residence, Defendant opted to remain at his residence, the officers did not handcuff Defendant or physically restrain or limit his freedom of movement, see Hinojosa, 606 F.3d at 883 (noting a factor against finding custody was that officers did not put the suspect in handcuffs or otherwise restrain his freedom), Defendant voluntarily sat down at the kitchen table and the interview lasted approximately an hour. See United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999) (finding that the defendant being summoned to a room and being told that giving false information would be a serious matter did not "even remotely constitute[] a restraint on the freedom of movement to the degree associated with formal arrest" nor did the interview lasting an hour and a half render the interview custodial).

Further, Adkins told Defendant he was not under arrest, that he was free to leave, that he did not have to speak or answer Adkins's questions and Adkins offered to conduct the interview elsewhere if Defendant chose. See United States v. Swanson, 341 F.3d 524, 530 (6th Cir.2003) ("[A] statement by a law enforcement officer to a suspect that he is not under arrest is an important part of the analysis of whether the suspect was 'in custody.'"); Salvo, 133 F.3d at 946, 951 (suspect not in custody where one of the agents informed the suspect that he was not under arrest, that he was free to leave at any point, and that he did not have to talk to them); Coomer, 533 F.3d at 487 (finding significant that officer told suspect that she was not under arrest); United States v. Tummins, 517 F. App'x 342, 344 (6th Cir. 2013) ("[W]hether an officer explicitly tells the suspect that he or she is not under arrest is an important part of the analysis of whether a suspect is in custody."). Moreover, at the end of the interview, Adkins did not arrest Defendant that is "consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." Yarborough, 541 U.S. at 664; Panak, 552 F.3d at 467 ("At the end of the interview, the officers did

not arrest [the defendant] . . . ; they simply thanked him and left.") (citing <u>Yarborough</u>, 541 U.S. at 664).

Similarly, as to the January 9, 2012, interview, Adkins interviewed Defendant at Defendant's residence, Defendant gave Adkins permission to enter the residence, Adkins was alone, and Adkins advised Defendant that he did not have to talk to him, that he did not have a search warrant for his residence, that he could tell Adkins to leave, and that Defendant could answer any or none of his questions. Defendant also voluntarily told Adkins that the officers did not search a closet hidden behind a mirror in his bedroom and offered Adkins to search it. Adkins did not arrest or threaten Defendant with arrest, and the interview lasted approximately 48 minutes. Based upon the totality of the circumstances and the controlling law previously discussed, the Court concludes that Defendant was not in custody for <u>Miranda</u> purposes during this interview.

As to the April 4, 2012 interview, the Government asserts that it is not using any of Defendant's statements made during this interview. Testimony from Adkins and Roberts at the suppression hearing revealed that the Government did not derive any evidence or information from Defendant's April 4, 2012 interview. Accordingly, Defendant's motion to suppress concerning the April 4, 2012 interview should be denied as moot.

The record also reflects that the documents and photographs shown to Defendant during his interviews on January 5, 2012, January 9, 2012 and April 4, 2012, have been identified. Thus, Defendant's request that any of these documents and photographs be suppressed for failure to identify should be denied.

As to the January 6, 2012 interview of the alleged victim witness, the Government asserts that it does not intend to use the recorded interview or transcript of the interview in lieu of the

not arrest [the defendant] . . . ; they simply thanked him and left.") (citing <u>Yarborough</u>, 541 U.S. at 664).

Similarly, as to the January 9, 2012, interview, Adkins interviewed Defendant at Defendant's residence, Defendant gave Adkins permission to enter the residence, Adkins was alone, and Adkins advised Defendant that he did not have to talk to him, that he did not have a search warrant for his residence, that he could tell Adkins to leave, and that Defendant could answer any or none of his questions. Defendant also voluntarily told Adkins that the officers did not search a closet hidden behind a mirror in his bedroom and offered Adkins to search it. Adkins did not arrest or threaten Defendant with arrest, and the interview lasted approximately 48 minutes. Based upon the totality of the circumstances and the controlling law previously discussed, the Court concludes that Defendant was not in custody for <u>Miranda</u> purposes during this interview.

As to the April 4, 2012 interview, the Government asserts that it is not using any of Defendant's statements made during this interview. Testimony from Adkins and Roberts at the suppression hearing revealed that the Government did not derive any evidence or information from Defendant's April 4, 2012 interview. Accordingly, Defendant's motion to suppress concerning the April 4, 2012 interview should be denied as moot.

The record also reflects that the documents and photographs shown to Defendant during his interviews on January 5, 2012, January 9, 2012 and April 4, 2012, have been identified. Thus, Defendant's request that any of these documents and photographs be suppressed for failure to identify should be denied.

As to the January 6, 2012 interview of the alleged victim witness, the Government asserts that it does not intend to use the recorded interview or transcript of the interview in lieu of the

witness's live testimony nor attempt to have the witness testify as to inadmissible hearsay. "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis in original). As there has not been a trial, Defendant fails to show that he has been denied the right to confront this witness in violation of the Sixth Amendment. Crawford v. Washington, 541 U.S. 36 (2004) (finding that a recorded statement was testimonial, but barred under the Confrontation Clause as the witness was unavailable and defendant did not have prior opportunity to cross-examine witness, regardless of whether the statement was deemed reliable by the state court).

Defendant asserts that to the extent the witness is available at trial Adkins tainted the witness's testimony through his leading questions. At trial, Defendant will have the opportunity to challenge the witness's testimony and may attempt to call an expert to challenge any alleged problems with Adkins's interviewing technique that may discredit the witness.

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

Fensterer, 474 U.S. at 21-22.

Defendant, however, asserts that he lacked the opportunity to cross examine the witness at the time of the January 6, 2012 interview. Defendant does not cite any authority in support of his contention that defense counsel be present during an investigative interview of a witness by a law enforcement officer. The Government fulfilled its obligation by providing Defendant with the

witness's interview. Defendant is not entitled to anything more with regard to this witness. See United States v. Tipton, 90 F.3d 861, 889 (4th Cir.1996) ("[T]here is no right to have witnesses compelled to submit to interview"); United States ex rel. Jones v. DeRobertis, 766 F.2d 270, 274 (7th Cir.1985) ("The inability of a defendant to interview witnesses is a constitutional problem only if the state artificially restricted the defendant's ability to obtain evidence."); United States v. Pepe, 747 F.2d 632, 655 (11th Cir.1984) ("It is clear that the government had no duty, absent a court order, to present its witnesses for interviews."); United States v. Savage, Nos. 07–550–03, 07–550–04, 07–550–05, 07–550–06, 2013 WL 271800, at *3 (E.D. Pa. Jan. 24, 2013) ("There is no constitutional guarantee granted to a defendant to interview a witness.").

Next, Defendant cites several research articles to support his argument that the victim witness should not be permitted to testify because the interview was "inappropriate." In support, Defendant cites the articles, Margaret-Ellen Pipe, et al., "Do Best Practice Interviews with Child Abuse Victims Influence Case Outcomes?" (2008), https://www.ncjrs.gov/pdffiles1/nij/grants/224524.pdf and Sara Harris, "Toward a Better Way to Interview Child Victims of Sexual Abuse," NIJ Journal, Issue No. 267 (2010), http://www.nij.gov/journals/267/Pages/child-victim-interview.aspx. These articles discuss a study that examined the outcomes of cases before and after police detectives were trained using the National Institute of Child Health and Human Development ("NICHD") protocol for interviewing sexual abuse victims between the ages of 2 and 14. Yet, here the witness was 17 when Adkins interviewed her, and thus, these articles are not probative to the facts in this criminal action.

Defendant also cites Lucy McGough, "Good Enough for Government Work: The Constitutional Duty to Preserve Forensic Interview of Child Victims," http://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1242&context=lcp. This article argues

16

for the videotaping of forensic interviews of children. Again, Defendant's reliance on this article is equally misplaced to the facts here as Adkins audio recorded the 17 year old witness.

Lastly, Defendant cites Amy R. Warren, et al., "Assessing the Effectiveness of a Training Program for Interviewing Child Witnesses," Applied Developmental Science, Vol. 3, No. 2, 128-135 (1999). This article covered the results of a training program designed to improve investigative interviews with young children. The ages of the children in the study were 3 to 5 years old. Id. at 129, 130. Again, Defendant's reliance on this article is misplaced as the study involved preschool aged children.

Accordingly, for the above stated reasons, Defendant's argument that the victim witness should not be permitted to testify because the interview was "inappropriate" fails.

## C. Conclusion

For the reasons stated herein, Defendant's motions to suppress (Docket Entry Nos. 36, 42 and 46) should be denied.

An appropriate Order is filed herewith.

**ENTERED** on this the 25th day of February, 2014.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court